Geneva HENDERSON, et al, Plaintiffs,

v.

EMORY UNIVERSITY,
et al, Defendants.

CIVIL ACTION NO. 1:16–CV–2920–CAP

United States District Court,
N.D. Georgia, Atlanta Division.

Signed 05/10/2017

Bradley S. Wolff, Swift Currie McGhee & Hiers, Atlanta, GA, Ethan D. Hatch, Heather Lea, Jerome J. Schlichter, Kurt C. Struckhoff, Michael A. Wolff, Troy A. Doles, Schlichter Bogard & Denton, LLP, St. Louis, MO, for Plaintiffs.

Brian T. Ortelere, Pro Hac Vice, Jeremy P. Blumenfeld, Pro Hac Vice, Morgan Lewis & Bockius-Philadelphia, Philadelphia, PA, Deborah S. Davidson, Morgan, Lewis & Bockius, LLP-IL, Chicago, IL, Emily Seymour Costin, Pro Hac Vice, Alston & Bird, LLP-DC, Matthew J. Sharbaugh, Sean Kenneth McMahan, Morgan Lewis & Brockius, LLP-DC, Washington, DC, Emily Catherine Hootkins, Howard Douglas Hinson, Patrick Connors DiCarlo, Alston & Bird, LLP-Atl, Jonathan Robert Poole, Strickland Brockington Lewis, LLP, Atlanta, GA, for Defendants.

## ORDER

CHARLES A. PANNELL, JR., United States District Judge

This matter is before the court on the defendants' motion to dismiss the first amended complaint [Doc. No. 41]. As an initial matter, the defendants' previously-filed motion to dismiss the complaint [Doc. No. 27] is dismissed as MOOT.

### I. Facts

The plaintiffs bring this case "individually and as representatives of a class of participants and beneficiaries of the Emory University Retirement Plan and the Emory Healthcare, Inc. Retirement Savings and Matching Plan (the "Plans")." Am. Compl. ¶ 1 [Doc. No. 30]. The plaintiffs' primary allegations are that the Plans' fiduciaries did not use their bargaining power to negotiate for lower expenses, exercise proper judgment in deciding what investment options to include in the Plans, allowing the recordkeepers to tie the Plans to certain investment options, and collecting "unlimited asset-based compensation from their own proprietary products." Am. Compl. ¶ 4 [Doc. No. 30]. "The Plans provide for retirement income for employees of Emory University, Emory Healthcare, Inc., Emory–Children's Center, Inc. (fka Emory Children's Center, Inc.), Wesley Woods Center of Emory University, Inc., and Emory Specialty Associations, LLC, each of which have adopted the Plans with the consent of Emory University or Emory Healthcare, Inc." Am. Compl. ¶ 11 [Doc. No. 30].

The Emory University Retirement Plan had $2.6 billion in net assets and 20,261 participants with account balances as of December 31, 2014. Am. Compl. ¶ 12 [Doc. No. 30]. As of that same date, the Emory Healthcare, Inc. Retirement Savings and Matching Plan had $1.06 billion in net assets and 21,536 participants with account balances. Am. Compl. ¶ 12 [Doc. No. 30].

The Emory University Investment Office develops the Plan investment strategy and investment policies. Am. Compl. ¶ 30 [Doc. No. 30]. The Emory University Investment Office manages the assets of the Plans. Am. Compl. ¶ 30 [Doc. No. 30]. "Emory Investment Management is responsible for selecting, retaining, and terminating the external investment managers and investment vehicles for the Plans, monitoring those investments, and implementing and ensuring compliance with the investment policies established by the Investment Committee." Am. Compl. ¶ 32 [Doc. No. 30]. The Emory University Board of Trustees oversees Emory Investment Management, and sets the investment policies for the Plans. Am. Compl. ¶ 33 [Doc. No. 30]. "The Investment Committee sets the Statement of Investment Objectives, Policies, and Guidelines (also known as an investment policy statement, or IPS) for the Plans ... [and sets investment objectives, establishing investment standards] and reviewing the reasonableness of Plan fees at least annually." Am. Compl. ¶ 33 [Doc. No. 30]. The plaintiffs assert that the Emory Investment Management, the Emory Pension Board, and the individual members are fiduciaries to the Plans. Am. Compl. ¶ 39 [Doc. No. 30].

The Emory Plans are known as 403(b) plans. Am. Compl. ¶ 81 [Doc. No. 30]. "Tax-exempt organizations, public schools (including state colleges and universities), and churches are eligible to offer plans qualified under § 403(b), commonly known as 403(b) plans. 26 U.S.C. § 403(b)(1)(A)." Am. Compl. ¶ 81 [Doc. No. 30].

### II. Legal Standard

When evaluating a motion to dismiss pursuant to Rule 12(b)(6), the court must take the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff. *Resnick v. Avmed, Inc.*, 693 F.3d 1317, 1321–22 (11th Cir. 2012). To survive Rule 12(b)(6) scruti-

ny, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "[F]acial plausibility" exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## III. Analysis

### A. Plaintiffs' Prudence Claims

"[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and ... with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). The defendants' first argument is that the plaintiffs' prudence claims fail as a matter of law.

#### 1. Count V

The defendants make two broad arguments to dismiss Count V. They argue that the plaintiffs fail to state a plausible claim that the Plans' investment management fees were excessive. Additionally, the defendants claim that the plaintiffs fail to plausibly allege that the defendants imprudently retained underperforming funds.

**a. The Defendants' Assertion that the Plans' Investment Management Fees Fall Within the Range that Courts have held to be Prudent**

The Plans have over $3 billion in assets. Am. Compl. ¶ 12 [Doc. No. 30]. The plaintiffs' complaint alleges that jumbo retirement plans, similar to the Plans, have great bargaining power when choosing what type of shares to offer its participants. Am. Compl. ¶ 169 [Doc. No. 30]. For instance, the plaintiffs assert that many of the Plans' retail class investment options also offered a similar lower-cost institutional class share, but that the Plans failed to use its bargaining power to obtain the institutional class shares for the Plans. Am. Compl. ¶ 170 [Doc. No. 30]. Additionally, the plaintiffs' complaint states that Vanguard and TIAA–CREF mutual funds routinely allow a waiver for large investment funds (similar to the Plans) to obtain lower cost shares even if they have not met the usual minimum asset threshold necessary to offer lower-cost institutional class shares to the Plans participants. Am. Compl. ¶ 174 [Doc. No. 30]. The complaint sets out close to 100 mutual funds used by the Plans with higher costs than identical mutual funds the Plans could have attempted to negotiate for with lower costs. Am. Compl. ¶ 176 [Doc. No. 30]. The defendants argue that the Plans' investment options offer a range of expense ratios from 0.07% to 1.41%, and that many courts have found this range to be reasonable. Defs.' Br. [Doc. No. 41–1 at 17].

The plaintiffs have properly stated a claim that choosing retail-class shares over institutional-class shares is imprudent.[1] *See Braden v. Wal–Mart Stores, Inc.*, 588 F.3d 585, 595–96 (8th Cir. 2009). The plaintiffs claim that offering retail-class shares with a higher expense ratio versus institutional-class shares with a lower expense ratio may be unacceptable. The plaintiffs' complaint asserts that the retail-class shares and the institutional-class shares were the exact same except for the expenses

---

1. The court notes that the actual fee range of 0.07% to 1.41% may generally be acceptable when the best investment options are chosen; that range may be unacceptable when lower-cost institutional shares could have been chosen instead.

charged to participants. While, the defendants argue and point to cases that hold that a motion to dismiss should be granted if based solely on retail versus institutional class shares, those cases also point out many other reasons why a plan chose one class over the other. In this case, the plaintiffs allege that the defendants did not use their bargaining power to obtain the lower cost fees and that the lower cost options are the exact same as the higher cost shares except for the actual fees charged. The plaintiffs assert that no reasonable fiduciary would choose or be complacent with being provided retail-class shares over institutional-class shares.

■ Lastly, the plaintiffs argue that having too many investment options is imprudent. The plaintiffs asserted that the Plans offered 111 investment options, and that many of those options were duplicative. Instead, the plaintiffs allege that the Plans should have offered fewer options and used more bargaining leverage with those investment options to obtain lower fees. The court does not agree with the plaintiffs' theory. Having too many options does not hurt the Plans' participants, but instead provides them opportunities to choose the investments that they prefer. *Loomis v. Exelon Corp.*, 658 F.3d 667, 673–74 (7th Cir. 2011). The plaintiffs' allegations that the defendants acted imprudently by offering too many investment options does not state a claim for relief.

**b. The Defendants' Assertion that the Plaintiffs Cannot State a Claim for Imprudence Based on the Use of Actively Managed Funds**

■ The defendants contend that the plaintiffs have not stated a claim that they acted imprudently by including actively managed funds instead of solely passively managed funds. The plaintiffs argue that the Plans' administrative and recordkeeping providers required the defendants to include their preferred investment lineup in the plan as investment options for participants. Am. Compl. ¶¶ 78, 137 [Doc. No. 30]. The plaintiffs contend that these fund options were not included in the Plans based on the best interest of the participants, but instead to benefit the Plans' service providers. Am. Compl. ¶¶ 78, 137 [Doc. No. 30]. TIAA–CREF required the Plans to "offer its flagship CREF Stock Account and Money Market Account, and to also use TIAA as recordkeeper for its proprietary products." Am. Compl. ¶ 136 [Doc. No. 30]. The plaintiffs argue that the Plans should have instead used an open architecture model. That would allow the Plans' fiduciaries to choose funds independently and in the best interest of the participants because the Plans would not be subject to using only the provider's investment products. Am. Compl. ¶ 79 [Doc. No. 30]. The plaintiffs contend that the defendants failed to properly analyze the funds allowed in the Plans, and that if they had analyzed the funds they would have learned that the actively managed funds (including the funds the recordkeepers required the Plans to use) would not outperform similar passively managed funds. Am. Compl. ¶ 206 [Doc. No. 30]. Even if an investment was no longer prudent, the plaintiffs argue that the defendants' agreement with the Plans' providers would not allow many of the funds to be removed because the contract with the providers required the Plans to retain the investment options. Am. Compl. ¶ 217 [Doc. No. 30].

The defendants argue generally that the plaintiffs' claim fails because simply having an actively managed fund instead of a passive fund is not imprudent. Defs.' Br. [Doc. No. 41–1 at 18–19]. However, the plaintiffs' claims are not that simplistic. The plaintiffs contend that the defendants acted imprudently because they did not properly analyze the funds used in the Plans, were

forced to use certain funds provided by the recordkeepers, and the Plans' fiduciaries were persuaded by certain recordkeepers to use their funds without researching or choosing other funds. The plaintiffs have sufficiently alleged that the defendants' process for choosing and analyzing certain funds was flawed. *See Braden*, 588 F.3d at 595–96 (finding that "the process by which appellees selected and managed the funds in the Plan would have been tainted by failure of effort, competence, or loyalty"). The defendants' assertion that the plaintiffs have not properly alleged that the defendants' use of actively managed funds was imprudent fails.

### c. The Defendants' Assertion that the Plaintiffs' Fee "Layering" Claim Fails to State a Claim

■ The defendants argue that the fees assessed for the annuities offered by the Plans were reasonable and not excessive. Defs.' Br. [Doc. No. 41–1 at 19]. The plaintiffs allege that two of the accounts included in the Plans charge unnecessary fees. They allege that the CREF Variable Annuity Accounts include unneeded layers of expense charges, including: an administrative expense charge, a distribution expense charge, a mortality and expense risk charge, and an investment advisory expense charge. Am. Compl. ¶ 140 [Doc. No. 30]. Additionally, they contend that the TIAA Real Estate Account includes those same four expenses, and a fifth expense for a liquidity guarantee. Am. Compl. ¶ 143 [Doc. No. 30]. The plaintiffs argue that the distribution expenses and mortality and expense risk charges are unnecessary for the Plans. Am. Compl. ¶ 141 [Doc. No. 30]. The plaintiffs' first allegation is that the administrative and investment management expenses were excessive for the services provided. The amended complaint then alleges that distribution expenses are charged for marketing and advertising the fund to potential investors, but the plaintiffs claim that this is unnecessary since

the funds are selected by the Plans' sponsor and the participants have no choice. Am. Compl. ¶ 141 [Doc. No. 30]. Additionally, the plaintiffs state that the mortality and expense risk charges assessed are not relevant to all participants, but benefit only those participants that elect to annuitize their holdings upon retirement. Am. Compl. ¶ 141 [Doc. No. 30]. Finally, the plaintiffs allege that all five of the expenses aid the fund companies but not the Plans' participants. Am. Compl. ¶¶ 141, 144, 278 [Doc. No. 30].

The fees charged by funds in a plan should benefit the participants. *See Braden*, 588 F.3d at 595–96. Additionally, the fund options chosen for a plan should not favor the fund provider or the fiduciary over the participants. *See id.* at 596. Thus, the plaintiffs' allegations that the Plans' funds charged fees that were excessive and/or provided a benefit to TIAA but not to the benefit of the participants are sufficient to state a claim for relief.

### d. The Defendants' Assertion that the Plaintiffs Fail to Plausibly Allege that Defendants Imprudently Retained Underperforming Funds

■ The defendants argue that the plaintiffs' claim that the defendants retained underperforming stocks should be dismissed. Specifically, the defendants point to the CREF Stock Account and TIAA Real Estate Account. The plaintiffs' complaint alleges that "The CREF Stock Account ... had a long history of substantial underperformance compared to ... actively managed alternatives over the one-, five-, and ten-year periods ending December 31, 2009." Am. Compl. ¶ 226 [Doc. No. 30]. Likewise, the plaintiffs contend that "The TIAA Real Estate Account had a long history of substantial underperformance relative to the Vanguard REIT Index over the one-, five-, and ten-year periods ending December 31, 2009." Am.

Compl. ¶ 238 [Doc. No. 30]. The plaintiffs allege that "The CREF Stock Account has excessive and unnecessary fees, has consistently underperformed for years, and continues to underperform its benchmark . . . and underperformed lower-cost actively and passively managed investments that were available to the Plans, yet has not been removed from the Plans nor frozen to new investments." Am. Compl. ¶ 210 [Doc. No. 30]. Further, the plaintiffs state, "Historical performances of the CREF Stock Account has been persistently poor for many years compared to . . . [the] benchmark index (Russell 3000 Index), and also as compared to available low-cost index funds." Am. Compl. ¶ 222 [Doc. No. 30]. Presently, the parties disagree as to what the correct benchmark is for the CREF Stock Account. The proper benchmark can be more appropriately determined on summary judgment.

Similarly to the CREF Stock Account, the plaintiffs allege that the "Defendants failed to conduct such a process and continue to retain the TIAA Real Estate Account as a Plan Investment option despite its continued underperformance and higher cost compared to available investment alternatives." Am. Compl. ¶ 240 [Doc. No. 30]. The defendants again argue that the plaintiffs used incorrect comparisons to the TIAA Real Estate Account. As set forth above, the proper benchmark can be more appropriately determined on summary judgment.

■ The plaintiffs have properly alleged that the defendants acted imprudently by retaining underperforming funds. "A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Tibble v. Edison Int'l*, —— U.S. ——, 135 S.Ct. 1823, 1829, 191 L.Ed.2d 795 (2015). The plaintiffs' allegations sufficiently state that the defendants failed to remove the CREF Stock Account and TIAA

Real Estate Account after periods of underperformance and higher costs compared to similar funds. Am. Compl. ¶¶ 210, 240 [Doc. No. 30]. Therefore, the plaintiffs' claim that the defendants acted imprudently by retaining the CREF Stock Account and TIAA Real Estate Account will not be dismissed.

### e. The TIAA Traditional Annuity

■ The plaintiffs allege in their complaint that the defendants should have used a stable value fund instead of the TIAA Traditional Annuity. Am. Compl. ¶ 98 [Doc. No. 30]. The defendants argue that stable value funds have underperformed the TIAA Traditional Annuity over the last one, three, five, and ten years. Defs.' Br. [Doc. No. 41–1 at 25]. The defendants are improperly arguing questions of fact at this stage. Taking the plaintiffs allegations as true, a stable fund could have been an alternative option to the TIAA Traditional Annuity. Therefore, the court will not dismiss the plaintiffs' claim related to an alternative investment option to the TIAA Traditional Annuity.

### 2. Count III

Count III relates to the Plans charging unreasonable administrative fees. The defendants argue that the types of fees charged are reasonable and commonly used.

### a. The Defendants' Argument that "Revenue Sharing" is a Common and Accepted Practice

■ Revenue sharing is "a common method of compensation whereby the mutual funds on a defined contribution plan pay a portion of investor fees to a third party." *Tussey v. ABB, Inc.*, 746 F.3d 327, 331 (8th Cir. 2014). The defendants argue that "revenue sharing" is common industry practice. Defs.' Br. [Doc. No. 41–1 at 26]. They contend that "revenue sharing" is

more beneficial to participants with lower balances (because the participants with lower balances will pay fees proportional to their total assets instead of paying the same fee as all participants in the Plan) than a flat-rate per-participant fee where each participant pays identical fees. Defs.' Br. [Doc. No. 41–1 at 26].

The plaintiffs' complaint alleges that "Revenue sharing, while not a *per se* violation of ERISA, can lead to excessive fees if not properly monitored and capped." Am. Compl. ¶ 74 [Doc. No. 30]. The plaintiffs argue that a recordkeeper's fee should depend on the number of participants and not the amount of assets in a plan. Am. Compl. ¶ 71 [Doc. No. 30]. The plaintiffs' allege that the defendants' "revenue sharing" method is improper and overcompensates the recordkeepers. Am. Compl. ¶¶ 74–75 [Doc. No. 30].

At this point, the plaintiffs' do not have the burden "to rule out every possible lawful explanation" for the allegedly overcharged recordkeepers' fees used in the Plan. *Braden*, 588 F.3d at 596–97. The defendants can be held accountable for failing to monitor and making sure that the recordkeepers charged appropriate fees and did not receive overpayments for their services. *Tussey*, 746 F.3d at 336. Therefore, the plaintiffs' claim regarding "revenue sharing" will not be dismissed.

**b. The Defendants' Assertion that ERISA does not Require Fiduciaries to Utilize a Single Recordkeeper or Solicit Recordkeeping Bids**

■ The defendants continue to argue issues of fact at the motion to dismiss stage instead of attempting to show that the plaintiffs have failed to state a claim. They argue that the plaintiffs failed to allege that one vendor would have been able to provide the needed investment options. Defs.' Br. [Doc. No. 41–1 at 27]. The defendants suggest that it may be reasonable that Fidelity, TIAA, and Vanguard

(all three of which the defendants use as recordkeepers) are the best options to use. Defs.' Br. [Doc. No. 41–1 at 27]. On the other hand, the plaintiffs' complaint states "Despite the long-recognized benefits of a single recordkeeper for a defined contribution plan, Defendants have continued to contract with *three* separate recordkeepers for the Plans: TIAA–CREF, Fidelity, and Vanguard. This inefficient and costly structure has caused Plan participants to pay excessive and unreasonable fees for Plan recordkeeping and administrative services." Am. Compl. ¶ 150 [Doc. No. 30]. The plaintiffs also allege that similarly-sized plans have a single recordkeeper instead of multiple recordkeepers, which helps keep costs lower. Am. Compl. ¶ 149 [Doc. No. 30]. The plaintiffs' allegation that a prudent fiduciary would have chosen one recordkeeper instead of three is sufficient to state a claim for relief.

■ Additionally, the defendants argue that the plaintiffs' claim to have a competitive bidding process to choose a recordkeeper should be dismissed. Defs.' Br. [Doc. No. 41–1 at 27]. The plaintiffs allege in their amended complaint that the defendants should have put the recordkeeping services out for competitive bidding every three years. Am. Compl. ¶ 148 [Doc. No. 30]. The amended complaint states, "the Plan's fiduciaries caused the Retirement Plan to pay well over 1140% and 1843% more than what was a reasonable fee for recordkeeping services." Am. Compl. ¶ 161 [Doc. No. 30]. The defendants argue that nothing in ERISA requires competitive bidding. However, the plaintiffs' allegation of the absence of competitive bidding for the recordkeeping services was imprudent; therefore, the plaintiffs' claim is sufficient to state a claim for relief. *See George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 798–99 (7th Cir. 2011).

### 3. Count I

The defendants argue that the plaintiffs' "Locking In" claim (Count I) fails as a matter of law and is time-barred. The plaintiffs' allege in their amended complaint that:

> By allowing TIAA–CREF to mandate the inclusion of the CREF Stock Account and Money Market Account in the Plans, as well as the TIAA Traditional Annuity, and to require that it provide recordkeeping for its proprietary options, Defendants committed the Plans to an imprudent arrangement in which certain investments had to be included and could not be removed from the plan *even if they were no longer prudent investments*, and prevented the Plans from using alternative recordkeepers who could provide superior services at a lower cost. In so doing, Defendants abdicated their duty to independently assess the prudence of each option in the Plans on an ongoing basis, and to act prudently and solely in the interest of participants in selecting the Plans' recordkeeper. By allowing TIAA–CREF to dictate these terms, Defendants favored the financial interests of TIAA–CREF in receiving a steady stream of revenues from TIAA–CREF's proprietary funds over the interest of participants.

Am. Compl. ¶ 250 [Doc. No. 30]. The plaintiffs allege that the defendants failed to engage in reasoned decision-making to determine the prudence of the investment options. Am. Compl. ¶ 251 [Doc. No. 30]. "By allowing the Plans to be bound by this requirement, Defendants failed to conduct an independent evaluation of the prudence of this option, which contradicts every principle of prudent investing because an investment that was no longer prudent could not be removed from the Plans." Am. Compl. ¶ 217 [Doc. No. 30]. The defendants argue that they did not follow an imprudent process and that the plaintiffs rely on only hindsight to determine that the account underperformed. Defs.' Br. [Doc. No. 41–1 at 28]. Additionally, the defendants claim that the plaintiffs' "Locking In" allegation is time-barred because the challenged actions occurred more than six years prior to the filing of the complaint. Defs.' Br. [Doc. No. 41–1 at 29].

"A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Tibble*, 135 S.Ct. at 1829. "[T]he duty of prudence involves a continuing duty to monitor investments and remove imprudent ones under trust law." *Id.* Here, the plaintiffs have alleged that the defendants acted imprudently by "locking in" to the CREF Stock Account and TIAA Recordkeeping—that the defendants had no process to remove these accounts and failed to monitor them and remove imprudent investments. These allegations are sufficient to state a claim for relief.

As to the defendants' assertion that the plaintiffs' claim is time-barred, "[n]o action may be commenced . . . with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part . . . (1) six years after (A) the date of the last action which constituted a part of the breach or violation." 29 U.S.C. § 1113(1). The plaintiffs argue that their claim is timely and "Plaintiffs do not challenge the *initial* arrangement, but maintaining the arrangement and the failure to monitor and remove CREF Stock within the six years preceding the complaint." Pls.' Resp. [Doc. No. 48 at 16]. With this limitation, the plaintiffs' claim with respect to the failure of the defendants to properly monitor and/or remove the allegedly imprudent "locked in" accounts that occurred may proceed. The claims in Count I will be dismissed to the extent the plaintiffs are seeking any damages that occurred more

than six years prior to the complaint being filed caused by imprudence.

## B. The Plaintiffs' Prohibited Transactions Claims

### 1. Counts II, IV, and VI

■ The defendants first argue that the plaintiffs' prohibited transactions claims are time-barred by the six-year statute of limitations under 28 U.S.C. § 1113. The court will take this matter up at a later date. It is not clear from the pleadings when the prohibited transactions took place. For instance, the defendants argue that all the alleged prohibited transactions took place over six years prior to this case being filed. Defs.' Br. [Doc. No. 41–1 at 31]. However, the plaintiffs' amended complaint alleges that the CREF Stock Account, for example, was included in the Plans beginning in 2010. Am. Compl. ¶ 210 [Doc. No. 30]. Therefore, depending on the exact date that account was included in the Plans, that transaction may have occurred within six years of this suit being filed. Furthermore, the court will not determine at this time whether there is a duty by the defendants to continually monitor and remove prohibited transactions like in *Tibble*, 135 S.Ct. at 1829, or if the plaintiffs have a claim for only the original transaction that took place.

■ The defendants next argue that Count II's prohibited transaction claim should be dismissed because there is no relevant case law prohibiting a plan from agreeing to lock in a certain type of investment. The prohibited transactions statute states:

(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—(A) sale or exchange, or leasing, of any property between the plan and a party in interest; (B) lending of money or other extension of credit

between the plan and a party in interest; (C) furnishing of goods, services, or facilities between the plan and a party in interest; (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or (E) acquisition on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title.

29 U.S.C. § 1106(a). "The term 'party in interest' means, as to an employee benefit plan ... a person providing services to such plan." 29 U.S.C. § 1002(14)(B). Count II of the amended complaint alleges that the Plans locked into an arrangement that required the Plans to include the CREF Stock Account and use TIAA as a recordkeeper, even though the fees were unreasonable for the services provided. Am. Compl. ¶ 256 [Doc. No. 30]. The plaintiffs contend that the defendants knew or should have known that these transactions were prohibited by 29 U.S.C. § 1106(A), (C), and (D). The amended complaint states "These transactions occurred each time the Plans paid fees to TIAA–CREF in connection with the Plans' investments in the CREF Stock Account and other proprietary options that paid revenue sharing to TIAA." Am. Compl. ¶ 256 [Doc. No. 30]. The defendants argue that ERISA does not prohibit a plan from making a stock account mandatory. Defs.' Br. [Doc. No. 41–1 at 33]. However, the plaintiffs' allegations that TIAA–CREF is a party in interest, and that the Plans improperly engaged in a transaction prohibited by 29 U.S.C. § 1106(a)(1)(A), (C), and (D) are sufficient to state a claim for relief.

Next, the defendants argue that Counts IV and VI should be dismissed because ERISA has an exemption that allows the recordkeeping and investment payments that the plaintiffs challenge. Defs.' Br. [Doc. No. 41–1 at 34]. "In particular, 29 U.S.C. § 108(b)(2) exempts arrangements for plan services so long as no more than 'reasonable compensation' is paid." Defs.'

Br. [Doc. No. 41–1 at 34]. Whether the fees were unreasonable is an issue that should be taken up at summary judgment. The reasonableness of the fees is a defense and did not have to be pleaded by the plaintiffs. *Braden,* 588 F.3d at 602 ("In short, the prohibited transactions [under § 1106(a)(1) ] involve self-dealing [and the] settled law is that in such situations the burden of proof is always on the party to the self-dealing transaction to justify its fairness."). Therefore, the plaintiffs have alleged facts sufficient to state a claim for a prohibited transaction. The defendants may raise reasonableness as a defense to the plaintiffs' allegations.

 Fourth, the defendants argue that Count VI should be dismissed because a mutual fund is exempted from being a party-in-interest. The defendants state "when a plan invests in a mutual fund, it is not transacting with [a] party-in-interest." Defs.' Br. [Doc. No. 41–1 at 35]. The plaintiffs' amended complaint alleges that "By placing investment options in the Plans in investment options managed by TIAA–CREF, Fidelity, and Vanguard in which the entirety of the Plans' approximately $3.7 billion in combined assets were invested, the Defendants caused the plans to engage in" prohibited transactions. Am. Compl. ¶ 290 [Doc. No. 30]. 29 U.S.C. § 1002(21)(B) states:

> If any money or other property of an employee benefit plan is invested in securities issued by an investment company registered under the Investment Company Act of 1940 [15 U.S.C.A. § 80a–1 et seq.], such investment shall not by itself cause such investment company or such investment company's investment adviser or principal underwriter to be deemed to be a fiduciary or a party in interest as those terms are defined in this subchapter . . . .

The Investment Company Act of 1940 regulates mutual funds. Here, the Plans had investment options that included mutual funds, bond account, annuities, real estate accounts, and others. Am. Compl. ¶¶ 127–132 [Doc. No. 30]. The investment options offered by Fidelity and Vanguard are exclusively mutual funds. Am. Compl. ¶ 132 [Doc. No. 30]. TIAA–CREF's investment options include many types of investments, including mutual funds. Am. Compl. ¶¶ 127–131 [Doc. No. 30]. The exception from 29 U.S.C. § 1002(21)(B) excluding mutual funds is applicable to this case. The court will dismiss Count VI to the extent that the plaintiffs allege the Plans participated in a prohibited transaction concerning TIAA–CREF, Fidelity, and Vanguard mutual funds. 29 U.S.C. § 1002(21)(B). Count VI will proceed as to all other investment accounts other than mutual funds included in the Plans.

 Lastly, the defendants argue that "Counts II, IV, and VI must fail because Plaintiffs do not allege that the Plans' fiduciaries intended to benefit TIAA, Fidelity, and Vanguard, as opposed to the Plans and their participants." Defs.' Br. [Doc. No. 41–1 at 36]. Whether the Plans' fiduciaries intended to benefit TIAA, Fidelity, and Vanguard is an issue that can be better determined at the motion for summary judgment stage. Therefore, the court will not dismiss the plaintiffs' claims based on the defendants' theory that the plaintiffs failed to properly allege that the fiduciaries intended to benefit a party-in-interest. The defendants also argue that the allegations in the amended complaint that "a prohibited transaction occurred each time the Plans paid fees to a vendor through 'revenue sharing fails as a matter of law because revenue sharing payments are not plan assets . . . ." Defs.' Br. [Doc. No. 41–1 at 36]. The defendants rely on *Hecker v. Deere & Co.,* 556 F.3d 575, 584 (7th Cir. 2009) regarding 29 U.S.C. § 1106(a)(1)(D) that "Once the fees are collected from the mutual fund's assets and transferred to one of the Fidelity enti-

ties, they become Fidelity's assets again, not the assets of the Plans." The *Hecker* case is fact specific to mutual funds. The court agrees that fees collected from a mutual fund do not become assets of the plan, therefore, to the extent the plaintiffs allege that revenue sharing from a mutual fund is a prohibited transaction under 29 U.S.C. § 1106(a)(1)(D), those allegations cannot go forward under Counts II, IV, and VI.

### C. Plaintiffs' Disloyalty Claims

The duty of loyalty requires fiduciaries to act "solely in the interest" of plan participants and beneficiaries and "for the exclusive purpose of providing benefits to participants" and "defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). The plaintiffs have alleged that the Plans did not act for the benefit of the Plans' participants. Am. Compl. ¶ 248–49, 260–61, 284 [Doc. No. 30]. The plaintiffs' loyalty claims are sufficient to state a claim for relief.

### IV. Conclusion

For the reasons set for above, the defendants' motion to dismiss [Doc. No. 41] is GRANTED in part and DENIED in part. The defendants' first motion to dismiss [Doc. No. 27] is dismissed as MOOT. The plaintiffs' claim in Count V alleging that the defendants acted imprudently by offering too many investment options is DISMISSED. The claims in Count I will be DISMISSED to the extent the plaintiffs are seeking any damages that occurred more than six years prior to the complaint being filed caused by imprudence. Count VI is DISMISSED to the extent the plaintiffs allege the Plans participated in a prohibited transaction concerning TIAA–CREF, Fidelity, and Vanguard mutual funds. Additionally, to the extent the plaintiffs allege that revenue sharing from a mutual fund is a prohibited transaction under 29 U.S.C. § 1106(a)(1)(D), these allegations cannot go forward under Counts II, IV, and VI. All other claims remain.

**SO ORDERED** this 10th day of May, 2017.